*1244 CARNES, Circuit Judge,
dissenting:
I dissent from the decision to deny Ms. Silva’s petition for review of the order of removal, which is based on the denial of her application for asylum.
I.
The question is not whether the immigration judge should have found the statements Silva made in her asylum application and hearing testimony to be credible. The judge did credit her statements. Because he did, the law requires that we, too, accept Silva’s statements as truth. Yang v. U.S. Att’y Gen., 418 F.3d 1198, 1201 (11th Cir.2005); Vasquez-Mondmgon v. INS, 560 F.2d 1225, 1226 (5th Cir.1977). In reviewing a denial of asylum where the immigration judge credited the applicant, we are to take as true not only the statements she made during her testimony but also those contained in her application, at least where the two are consistent. See Nreka v. U.S. Att’y Gen., 408 F.3d 1361, 1364 (11th Cir.2005) (considering “his application for asylum and his testimony”); Sepulveda v. U.S. Att’y Gen., 401 F.3d 1226, 1229-30 (11th Cir.2005) (examining both “Sepulveda’s testimony and her asylum application” and stating standard of review in terms of “the record considered as a whole”). And, as the majority concedes, “Silva’s testimony was consistent with her asylum application.” Maj. Op. at 1240.
Silva said in her application that after FARC sent her the threatening note, she received almost daily threatening phone calls from FARC which continued until she left the country. She also stated that: “I was threatened to death by the FARC’s urban militias”; FARC “declared me a military objective”; “If I go back to Colombia ... [I will be] tortured and killed”; “I would be killed as FARC sentenced me”; and “I know that if I go back to my country I will be kill [sic].” She explained that if she went back FARC “will find me sooner or later, to be tortured and killed and FARC always does.” These application statements are consistent with her testimony. That should be all we need to know. See Menghesha v. Gonzales, 440 F.3d 201, 203 (4th Cir.2006) (reciting the “undisputed facts adduced in [the] asylum application and hearing testimony” and stating “[i]n the absence of contrary evidence or an adverse credibility determination, we accept [the] uncontested account as true.”).
The majority’s attempt to dismiss Silva’s asylum application as “ambiguous” compared to “her specific testimony” at the hearing is unconvincing. In fact, Silva’s application is as specific and detailed, if not more so, than her testimony. Her application actually contains more words than her testimony, and the bulk of what she said in her application is a lengthy and detailed explanation of the events preceding and following FARC’s attempt on her life. It is not ambiguous. Silva pointedly states that FARC tried to kill her and will kill her if she is forced to return to Colombia. To avoid a battle of scissors and trading snippets of Silva’s statements and testimony with the majority, I have attached as appendices to this opinion every part of her application where she made any statement about the facts (App.A), her entire testimony (App.B), and the immigration judge’s ruling (App. C). The interested reader can see for herself everything that Silva said and the context in which she said it.
In reading Silva’s testimony at the hearing we should keep in mind that there she only answered questions asked by the immigration judge — who expressed his skepticism of all asylum claims relating to Colombia — and by the attorney representing the Immigration and Naturalization Service. Silva had no attorney, spoke through *1245 an interpreter, and did not attempt to question herself. As a lay person, Silva may well have believed that the statements in her application entitled her to asylum. It is difficult for me to view that as an unreasonable belief, especially since it is one that I share. Again, the majority’s insistence that Silva’s testimony was more specific and detailed than her statements in her application is simply not accurate. Compare App. A (the asylum application) to App. B (the testimony).
While purporting to accept Silva’s credited statements as true, the majority actually does an end run around the credibility determination by selectively dismissing her statements that discomfort its position, labeling them as “speculative,” or suggesting that maybe Silva was not credible after all. For example, the majority more than once implies that maybe Silva should not be believed because she did not report to the police the threatening phone calls she received. Silva explained that she did not report them because she had been warned: “don’t you dare even think about making a report,” and that people in Colombia are too afraid to make police reports. In any event, her failure to report the threats and violence against her did not prevent the immigration judge from crediting her statements about what happened. While purporting not to reweigh the evidence, the majority actually does so by disregarding as not specific and not credible enough many of the statements that Silva made in her application and some of those she made while testifying at the hearing. Either Silva was credible, or she was not, and the immigration judge found her to be credible. We must take her statements, those in the asylum application as well as those she made while testifying, to be true.
Having determined that Silva was credible, the question before the immigration judge was whether the historical facts established by Silva’s application and testimony proved that she had suffered “persecution or a well-founded fear of persecution on account of ... [her] political opinion” within the meaning of § 101(a)(42)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42)(A). Our standard of review requires that we apply a substantial evidence test to determine if the immigration judge’s decision is supported by “reasonable, substantial, and probative evidence on the record considered as a whole.” Sepulveda, 401 F.3d at 1230; Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir.2001). If not, then the evidence would “compel” a reasonable factfinder to conclude otherwise than the immigration judge did, and we must reverse. Sepulveda, 401 F.3d at 1230. Because the standard of review in these cases is deferential, we have been loath to find that a petitioner has met her burden on appeal. This, however, is a case in which we should find she has done so.
II.
The facts established by Silva’s statements are these. Three weeks before she was shot at, Silva received a threatening “condolence note” from FARC. As the majority opinion recognizes, this threat was made solely because of Silva’s political activities in the countryside on behalf of the Visionary Party. The only fair interpretation of the “Rest in Peace” condolence note she was handed while engaging in political activities is that FARC was threatening to kill Silva because of those political activities.
Three weeks after FARC threatened to kill her for that reason, someone tried to carry out that threat. On October 9, 1999, while Silva was driving between the restaurant her family ran and her apartment, two gunmen on a motorcycle shot at her. The bullets shattered a window of her car, *1246 as Silva put it: “missing me by very little.” Shying away from the obvious, the majority opinion is willing only to assume that being shot at is persecution. I would be so bold as to hold that it is, especially when the attempted murder is preceded by a written threat to kill the victim because of her political activities and by an almost daily barrage of threatening phone calls at her home and restaurant.
The element the immigration judge found wanting, and the majority opinion concludes is not compelled by Silva’s statements and testimony, is that the shooting on October 9, 1999, and the threatening phone calls she received were on account of her political activities. The immigration judge and the majority are wrong. Not only did the shooting come only three weeks after FARC threatened to kill Silva because of her political involvement, it also came after she refused to stop her political activities despite the FARC threat. As Silva put it in her asylum application, after the threatening note, “I got scared but promise myself not to let these subversive [sic] intimidate me and continued with my political and social involvement.” She had last been involved in political activities just a few days before the attempt to kill her. In other words, FARC threatened Silva with death because of her political activities, she refused to give in to the threat and continued to engage in political activities, and promptly thereafter someone did try to kill her, just as FARC had promised it would.
Attempting to denigrate the compelling force of these facts, the majority opinion insists that the “connection between the shooting and her political activity was not immediately apparent even to Silva.” Maj. Op. at 1238. According to Silva’s credited testimony: “I had an attempt against my life, the FARC tried to kill me before I came over here.” That is why she sought asylum. During the hearing . Silva was asked this about the shooters: “Who were these two people, do you know?” and she answered “No.” The majority views that admission as of great significance, stressing that, “she did not know who fired the shots or made the phone call or why the shots were fired.” Maj. Op. at 1234. True enough, the would-be assassins did not stop to introduce themselves. They rarely do. It is not realistic to expect the targets of political assassinations to know the identity of the gunmen who shoot at them. Only, in the majority’s imagination do would-be killers wear name tags or drive around on motoi'cycles with vanity plates displaying the name of their terrorist organization. While Silva did not know the identity of the two people who shot at her, she testified that the shooting came only three weeks after FARC had made a written threat against her life because of her political activities. She also testified at the hearing that “FARC tried to kill me before I came over here.” ■
Contrary to the majority’s repeated contention that the phone calls weré “threatening, but not political,” Silva stated that the anonymous callers wanted her to stop her trips to the neighborhoods where she had engaged in political activities and that they knew about her family’s political participation. She testified at the hearing that the calls were “from the urban group,” an obvious reference to FARC. She also linked the attempted murder to her political activities. When asked why the men had shot at her, Silva testified that while she did not know, days before the attempt to kill her she had received the anonymous phone calls and only three weeks before that attempt she had received the condolence note from FARC while engaged in political activities. That testimony is entirely consistent with her statements in the asylum application that FARC wanted her dead and would kill her if she returned to Colombia. The evidence *1247 compels the conclusion that Silva did believe, and with good reason, that FARC tried to kill her.
FARC’s threat to kill Silva and the attempt that was made to do so are linked not only by closeness in time but also by the stream of anonymous, threatening phone calls Silva began receiving immediately after she was handed the condolence note from FARC. Describing the timing and content of those calls, Silva referred to the day she received that note from FARC and said:
From that moment on the phone calls from FARC started almost daily at my house and at my restaurant “Tomillo Laurel y Pimienta.” They were wanting me to stop with my visits to these neighborhoods and to my surprise they also knew all my family background and my family political participation. They mentioned that to kill me was a nice way to take revenge of my all my [sic] political relatives that were taking advantage of the Colombians who did not know the evil underneath my family that we were on[ly] looking for our welfare not for the welfare of the working class.
In response to the shooting, Silva stopped her political activities, and the threatening phone calls ceased. She immediately began preparations to flee and actually left for the United States on November 21, 1999. When Silva returned to Colombia in January of 2000 to visit a gravely ill relative, the threatening phone calls resumed, and they came on a daily basis. They continued until Silva left for the United States a second time two months later, and she has not been back to Colombia since.
The gist of the threatening phone calls was: “We missed already once, don’t provoke us again. We missed on the 9th, we are not going to miss a second time, we’re going to kill you.” In one or more of the phone calls she received Silva was told that her family had always exploited the Colombian people and the violence had been directed at her because, unlike other members of her family, Silva did not have bodyguards. Silva testified that her family on her father’s side always had been involved in politics. She explained that by “family” she “meant uncles, cousins, my father’s cousins. My father’s side of the family.”
Unlike Silva, none of her four brothers had ever been involved in any type of politics. They lived in a house with Silva’s mother. None of the four non-political brothers (or the mother apparently) ever had any problems with FARC. The restaurant the family owned and ran never had any problems with FARC. The only person in Silva’s immediate family to get a death threat from FARC, to get shot at, and to be tormented daily by threatening phone calls was the politically active Silva, who had received a threatening note from FARC because of her political activities.
When asked if her cousin, the Mayor of Bogota’s secretary, had any problems, Silva testified: “They have always received anonymous phone calls, always. In Bogota in the whole Colombia they are always calling and sending letters to terrorize people.” Silva pointed out that the violence and threats of violence usually were targeted at those engaged in political activities. When asked if a lot of people get letters and phone calls, she explained: “Yes. If the person that’s involved in some political group or is the first time doing something that they are not in — that they don’t want this person to do for whatever reasons.”
In determining whether the facts and circumstances in any case compel a conclusion, we ought to face up to the full force of them in their entirety. The majority’s approach, instead, is a virtuoso exercise in deconstructionism. It proceeds by disas *1248 sembling the whole of the evidence and then explaining why each part by itself is insufficiently compelling. This is like a man who attempts to demonstrate that a bucket of water is not really that by emptying it cup by cup, asserting as he goes along that each cupful is not a full bucket’s worth until, having emptied the whole, he proclaims that there just wasn’t a bucket of water there.
The only reasonable conclusion from the facts established by Silva’s application statements and testimony, which were credited by the immigration judge, is that the reason she was threatened, shot at, and threatened again is her political activities. The evidence compels that conclusion. It is no answer to say to Silva, as the immigration judge did, that “I don’t see that you are in any worse position than anybody else in that country.” I doubt that all forty-three million people in Colombia are being persecuted by FARC— the evidence establishes that at least four of them, Silva’s non-political brothers, are not. In any event, the widespread nature of violence in a country is not a legitimate reason for denying asylum to a petitioner who establishes that she has been persecuted within the meaning of § 101(a)(42)(A) of the Immigration and Nationality Act. There is no numerosity exception in the asylum laws.
The majority opinion seems to endorse the immigration judge’s widespread terror exception to the asylum laws, finding comfort in the Colombian Country Report and the Country Profile’s being, in the majority’s words, “replete with descriptions of widespread and indiscriminate violence.” Maj. Op. at 1237. What the majority and the immigration judge fail to recognize is that the Country Profile indicates that much of the violence in Columbia is targeted at activities that are protected grounds under the asylum laws of this country. See Dep’t of State Bureau of Democracy, Human Rights and Labor, Colombia Profile of Asylum Claims & Country Conditions 3 (1997) (“[F]our out of every ten murders are targeted for their involvement with political, labor, or social causes.”). The fact that there is also indiscriminate violence is no reason for refusing to recognize violence and persecution on grounds that are specifically listed in our immigration laws. Otherwise, no one from Colombia would ever be eligible for asylum.
And indeed under the majority’s decision, no one from Colombia will be entitled to asylum. Since “[t]he majority of the violence in Colombia is not related to protected activity,” since the “awful is ordinary,” and since only “four out of every ten murders are on account of a protected ground,” Maj. Op. at 1242, it will always be reasonable to find that violence was not on account of a protected ground — even where, as here, a terrorist group threatens a political activist with death because of her politics, she receives a barrage of threatening phone calls connected in time to that threat and to her political activities, and soon thereafter someone attempts to kill her. This is not a good decision but there is, I suppose, a bright side. What the Court holds today will make it easier to handle our caseload. In the future we can simply stamp any petition for review of a Colombian’s asylum denial: “Affirmed. See the Silva decision.”
Today’s decision also has implications beyond cases involving Colombian applicants. The majority opinion refers to the often-mentioned, but never sighted, “rare case” in which the facts are so compelling that we will reverse an immigration judge’s finding that a petitioner has failed to prove persecution on a protected ground. No published opinion of this Court has ever found that rare case, and today’s decision indicates that such a case, *1249 like the fabled unicorn, exists only in our imagination.
APPENDIX A
APPLICATION FOR ASYLUM OR WITHHOLDING OF REMOVAL
PART C. INFORMATION ABOUT YOUR CLAIM TO ASYLUM
1. Why are you seeking asylum? Explain in detail what the basis is for your claim.
I am seeking political asylum in the United States, because my life is at risk in my country Colombia because of death treats by F.A.R.C.
I come from a family traditionally linked to the Conservative Party and very involved in politics. For our family it was very natural to actively participate with our party on different campaigns and on different positions in the government. On question no. I mentioned some of the names of my closed relatives that have had important political positions in my country. In 1994 I became involved with the Movi-miento Cívico Independiente Visionario, but for the mayoral position only, and this is because of the person who was running for this position.
I am very closed to my cousin Aicia Eugenia Silva, 'current general secretary of the Mayoralty in Bogota. Presided by Mayor Mockus. Together we participated on Mayor Mockuses political campaign. We believed on him even though he does not belong to the Conservative Party. He is from the “Partido Cívico Independiente” party, so anyone from any of the two traditional parties can vote for him. This is his second period as Bogota’s mayor, he was the Mayor of Bogota in 1994. He resigned from his first period in order to postulate himself for the Presidency in 1997, for the 1998 presidential elections. He lost the presidential elections but run for the mayoralty campaign, and was elected as Mayor again, on October 2000.
I worked very hard on both of Mayor’s Mockus campaigns because he is a very honest and hard working man, who is wanting to take the challenge of being the mayor of one of the most dangerous capitals of the world and works very hard to change and improve its image, even though I believe now that it is very difficult if not impossible, given the overwhelmed internal violence of my country.
I worked very actively for the 1994 may- or’s campaign, which fortunately we won. I started working for Antanas Mockus again in 1997 when he was running for President, which after a lot of efforts and worked, he lost. In August of 1999, after I came back from the United States I got involved again for his new postulation as mayor. I worked very actively in August, September and October when I had to leave the country because of the death threats against my life.
I began my political participation on this last campaign in August of 1999, after I went back to Bogota from my trip to the United States. I began working for the mayoralty campaign. I used to go to the party’s meeting at the headquarters every week, where we planned the different strategies that we were going to follow in order to pursue our goals. In there, we also organized the health campaigns that were going to take place in the different marginal neighborhoods. I also did this campaigns when I worked for the Conservative Party, and was aware of its procedures. Through these campaigns we helped the people and at the same time we got new adepts for the party.
My problems started around the third week of September of 1999, while I was in *1250 the “Santa Fe” neighborhood talking to the people about getting an education to get ahead in life and in order to help Colombia to overcome the difficult situation that it is currently involved in. After I finished talking a lady came to me and handed me an envelope which I kept in my pocket and thanked the lady. That evening in my house when I opened the envelope I realized that it was a suffrage with my name on it and the words: May Luz Marina Silva rest in peace, because she was doing what she was not suppose to in the wrong neighborhood. It was signed by FARC. Known the country’s situation, I got scared but promise myself not to let these subversive intimidate me and continued with my political and social involvement.
From that moment on the phone calls from FARC started almost daily at my house and at my restaurant “Tomillo Laurel y Pimienta”, they were wanting me to stop with my visits to these neighborhoods and to my surprise they also knew all my family background and my family political participation. They mentioned that to kill me was a nice way to take revenge of my all my political relatives that were taking advantage of the Colombians who did not know the evil underneath my family that we were on looking for our welfare not for the welfare of the working class.
On October 9, 1999, (a day that I will never forget). When I was going back home from my restaurant, in my car I was followed by 2 men on a motorcycle, that shoot at my car hitting the left rear window, missing me by very little. I accelerated and I don’t even know how I got home. From that moment on, I stopped all my activities and decided to leave the country which I did on March 8, 00, very sad and upset because I don’t know when I will be able to see my family and go back to my country.
FARC continued calling me at my house until the same day that I left the country. On the last call, I was told that I was missed on October 9, but that it was not going to happen again. For all these reasons I am seeking political asylum in this country. I know that if I go back to my country I will be kill.
2. Have you or any member of your family ever belonged to or been associated with any organization or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group, or the press or media?
Yes.
Traditionally, I and the rest of my family are of the Colombia Conservative Party.
To the Colombian Chamber of Commerce.
Alfonso Valdivieso, former Secretary of Justice in Colombia (Conservative Party). Cousin. He now is the Colombian Ambassador at the United Nations.
Humberto Silva Valdivieso, Governor of Santander, Colombia and Ambassador in Montevideo, Uruguay. Uncle.
Enrique Silva Valdivieso, Councilman of the Republic, in Bogota, Colombia. Uncle.
Alicia Eugenia Silva, Cousin, Former Secretary of Government, and current General Secretary to the Mayoralty with Mayor Mockus.
3. Have you or any member of your family ever been mistreated or threatened by the authorities of your home country or any other county or by a group or groups that are controlled by the government, or that the government of the country is unable or unwilling to control?
*1251 Yes.
If YES, was it because of ... [Yes] Political Opinion?
I was threatened to death by the FARC’s urban militias. Because of my family background and my political participation, many in my family have been threatened to death by the guerrilla but most of them are protected by bodyguards.
4. Have you or any member of your family ever been accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in your country or any other country, including the United States?
No.
5. Do you fear being subjected to torture (severe physical or mental pain or suffering, including rape or other sexual abuse) in your home country or any other country if you return?
Yes.
I was already psychologically tortured by FARC when I found out that, they declared me a military objective, I was shot at on October 9, 1999. I know that if I go back to Colombia the psychological torture will start all over again, knowing that they will find me sooner or later, to be tortured and killed and FARC always does.
See Addendum. [Response to Question 1]
6. What do you think would happen to you if you returned to the country from which you claim you would be subjected to persecution? Explain in detail and provide information or documentation to support your statement, if available.
I would be killed as FARC sentenced me.
See Addendum. [Response to Question 1]
7.Describe in detail your trip- to the United States from your home country. After leaving the country from which you are claiming asylum, did you or your spouse or child(ren), who are now in the United States, travel through or reside . in any other country before entering the United States?
No.
APPENDIX B
U.S. Department of Justice
Executive Office for Immigration Review
United States Immigration Court
Matter of LUZ MARINA SILVA, Respondent
In REMOVAL Proceedings
Transcript of Hearing
Before PEDRO MIRANDA, Immigration Judge
Date: December 13, 2002
Place: Miami, Florida
Transcribed by FREE STATE REPORTING, INC., at Annapolis, Maryland
Official Interpreter: Lanell Haza
Language: Spanish
Appearances:
For the Immigration and Naturalization
Service: Gail Schwartz
For the Respondent: Pro se
JUDGE FOR THE RECORD
December 13, 2002, Miami, Florida. I am Judge Pedro Miranda. These are removal proceedings in the case of Luz Marina Silva, 79 344 105. Present is the respondent, pro se; the Service represented by trial attorney Gail Schwartz (phonetic *1252 sp.) in the proceedings in. the Spanish language through Court interpreter Ms. La-nell Haza (phonetic sp.). We’re here for a hearing in the respondent’s application for asylum withholding of removal, relief under the torture convention.
JUDGE TO MS. SILVA
Ma’am, we’re here today for a hearing on your asylum case, are you ready to proceed?
MS. SILVA TO JUDGE
Yes.
JUDGE TO MS. SILVA
Did you try to get an attorney, ma’am?
MS. SILVA TO JUDGE
Yes.
JUDGE TO MS. SILVA
Do you have an attorney?
MS. SILVA TO JUDGE
No.
JUDGE TO MS. SILVA
Why not?
MS. SILVA TO JUDGE
I contacted several of the attorneys around the list, the Service’s list, and they couldn’t take my case because they were too busy. Then I contacted other attorneys and these attorneys were charging me too much money. I have here a copy of the letters from the people who sent me answers about my request. I don’t know if you need to see that.
JUDGE TO MS. SILVA
Well, I don’t need to see them, you have a right to an attorney, I can’t give you one. I can only give you time to get one if you want. If, you know, but if you don’t have an attorney then you will have to represent yourself. What do you want to do? Are you ready to represent yourself today?
MS. SILVA TO JUDGE
Yes.
JUDGE TO MS. SILVA
Okay, so you don’t want to get an attorney?
MS. SILVA TO JUDGE
No.
JUDGE TO MS. SILVA
Okay. Please stand and raise your right hand. Do you swear to tell the truth, the whole truth, and nothing but the truth, so help you God?
MS. SILVA TO JUDGE
Yes, I swear.
JUDGE TO MS. SILVA
Sit down. Now, I told you at previous hearings that if you represented yourself you have the right to present witnesses and documents in your case. Do you have any documents that you want the Court to look at?
MS. SILVA TO JUDGE
No.
JUDGE TO MS. SILVA
Okay. You can sit right there and testify from there, all right.
MS. HAZA TO JUDGE
I requested for her to get closer to the interpreter, Your Honor, thank you.
JUDGE TO MS. SILVA
Q. Now, your name is Luz Marina Silva?
A. Yes.
Q. You are Colombian? You have to use your voice, ma’am.
A. Yes.
Q. How old are you?
A. I’m 48.
Q. Are you married or single?
A. Single.
Q. Do you have any children?
*1253 A. No.
Q. Now, when did you come to the United States?
A. The last time I came into the United States was March 8, 2000.
Q. Had you been to the United States previous to that?
A. Yes.
Q. How many times?
A. Twice.
Q. When was the first time?
A. June 10, ’99.
Q. Why did you come here on June 10, ’99?
A. As a tourist.
Q. How long did you stay?
A. One month.
Q. Then you went back to Colombia?
A. Um-hum, yes.
Q. And when did you come back?
A. November 21, ’99.
Q. What was the purpose of that visit?
A. Because I had an attempt in Colombia from the FARC (phonetic sp.).
Q. So why did you come here?
A. Because if I had stayed in my country probably something would have happened to me, and it was the easiest and fastest way to come to this country.
Q. Did you come with a tourist visa?
A. Yes.
Q. How long did you stay?
A. A little over a month.
Q. Who did you stay with when you came that time?
A. The second time?
Q. Yes.
A. I was in an apartment in Miami Beach.
Q. Did you rent the apartment?
A. Yes.
Q. So why did you only stay a month and a half if you had had a problem in Colombia?
A. Well I started watching off already that things had already been over with, I have spent Christmas and New Year’s here, I felt anguish. I had an aunt back in Balta who was gravely ill and I thought enough time had elapsed and that I could go back, that things might be different.
Q. And where did you live in Colombia, Balta?
A. Yes.
Q. How long had you lived in Balta?
A. My whole life.
Q. Did you belong to any, any groups or organizations in Colombia?
A. Yes, always.
Q. What?
A. Yes, I belonged to the conservative group. My family had always belonged to the conservative group, and lately I was working with Antanna Mockus.
Q. Who is Antanna Mockus?
A. At this moment he is the mayor of the city of Bogota.
Q. What do you mean you worked for him?
A. For his party, visionary party. I did politics for him.
Q. Since when did you do politics for him?
A. More or less since ’94.
Q. How long has he been the mayor of Bogota?
A. At this moment two years.
Q. Was he running for mayor in ’94?
A. Yes.
*1254 Q. Did he win?
A. Yes, he won in ’95.
Q. So how long has he been the mayor of Bogota?
A. No, he was the mayor from ’95 to ’97, and then he resigned before ’97 because he was running for the presidency of the republic.
Q. He ran for the presidency of Colombia?
A. Yes
Q. On behalf of what party?
A. Visionary.
Q. So were you a member of that party?
A. Yes.
Q. I thought you were a member of the conservative party?
A. Always.
Q. Both then?
A. Yes, always but people who belong to the visionary party can be, can be from either party, the two stronger parties of Colombia, the liberal party and the conservative party. They can belong to the visionary party and be with both groups.
Q. So how many times has Mr. Mockus run for public office?
A. Twice for the mayor’s office and one for the presidency.
Q. And did you help him out in all three of these campaigns?
A. Yes, always.
Q. What was your job in the campaign?
A. Well, organize the help brigade, talk to people so they would vote for the party, go to the headquarters and listen to the party’s platform.
Q. Did you occupy any particular position with a title in any of the campaigns?
A. No, no.
Q. Were you in charge of people?
A. No. Only corporation.
Q. Did you speak publicly?
A. With the people around me to be in front of an audience using a microphone, no, but only the people around me.
Q. Did you have a paying job in Bogota?
A. A restaurant.
Q. You owned a restaurant?
A. Yes.
Q. What was the name of the restaurant?
A. Tol Medrial Mebianta (phonetic sp.)
Q. Were you a sole owner?
A. Yes.
Q. And this restaurant is in Bogota?
A. Yes.
Q. When did you open it?
A. More or less around 1991.
Q. Okay. Is it still open?
A. Yes, my mother has it.
Q. Do you still own it?
A. Yes.
Q. Why did you come to the United States, why are you seeking asylum, ma’am?
A. Because I had an attempt against my life, the FARC tried to kill me before I came over here.
Q. That was before you came in November of ’99?
A. Yes.
Q. When was this attempt, when?
A. It happened October 9, 1999.
Q. What happened?
*1255 A. I was leaving my restaurant, the restaurant is in my house, in my mother’s house on the first floor.
Q. Okay.
A. I was on my way to my apartment from the restaurant, two men arrived in a motorcycle, two people, and these people, these two men came close to my car and they shot into the car. The bullet did not hit me because it went in to the back window. And that is why I am here asking for political asylum.
Q. Who were these two people, do you know?
A. No.
Q. Why did they shoot you, shoot at you, do you know?
A. I have no idea but days before I was receiving — they were calling me anonymous phone calls.
Q. Who was calling you?
A. Different people always. In one of the neighborhoods where we were doing the help brigade I received a condolence note.
Q. When did you receive a condolence note?
A. Around three weeks before the attempt.
Q. What did the note say?
A. Luz Marina Silva rest in peace for doing what she shouldn’t be doing in the wrong place and the FARC signed it.
Q. Do you have that condolence letter?
A. No.
Q. Where is it?
A. I lost it, it disappeared. To tell you the truth I never thought that I was going to be the victim of an attempt. And one never things that.
Q. Okay, did you report this, any of these calls, the note or the shooting to the police?
A. No.
Q. Why not?
A. Because on the day of the attempt on that evening at 7 p.m., 7 in the evening, they called me at my apartment and they told me don’t you dare even think about making a report. That is a well known fact in Colombia.
Q. Who called you?
A. One man.
Q. Identified?
A. No, no, never in any of them.
Q. So you were too scared to go to the police?
A. Yes.
Q. So what you did was you came to the United States the next month?
A. Yes, in November.
Q. Between that — up to November of 1999 had you had any other problems?
A. No, no, no.
Q. So you returned to Bogota when, in January of 2000?
A. Yes.
Q. Okay, and did you have any further problems after you returned to Bogota?
A. Yes.
Q. What happened?
A. I began to receive once again telephone calls from the urban group.
Q. Before the calls previous had been anonymous. Were these calls identified?
A. No. The same way, anonymous.
Q. What did they say?
A. We missed already once, don’t provoke us again. We missed on the 9th, we are not going to miss a second time, we’re *1256 going to kill you. A' very rude, very obscene.
Q. Did you — what did they mean, don’t provoke us again?
A. To provoke means — -not to provoke them means not to be there, if I had already come here not to return.
Q. After you returned in January of 2000 how many threatening calls did you receive until you left two months later?
A. They were always daily, all the time.
Q. Always anonymous?
A. Yes.
Q. Aside from calls did you have any other problems during this time?
A. No.
Q. When was the last time that you were involved in politics?
A. Before the attempt.
Q. That’s a long' — 'that could be any time, when? When was the last time you participated?
A. A few days before the attempt in October, since I arrived, since I returned in the United States, August, September, October, more or less.
Q. Did anybody else working with you have problems?
A. No, none.
Q. You were the only one?
A. Yes, but what it is is that my family has always been involved in politics.
Q. So, so have many other families in Colombia. Why would you be singled out?
A. Well, I have a cousin, Alicia Alhanio Silva (phonetic sp.) and she’s completely immersed in the visionary party, and I have always helped her. Currently she is the secretary for the mayor of office, for Mockus right now at this time. In one of the telephone calls, the anonymous telephone calls that I received I was told that my family had always exploited the Colombian people. And supposedly I was the one who suffered the attempt that the did this to me because it was easier to get to me than to get to members of my family that have bodyguards.
Q. How do you know all this, how do you know this? Is this something that you’re speculating on, or how do you know this?
A. That’s why — that’s the way that they had to take revenge on my family. The one phone call they said, they said, during one of those phone calls is that this is a way that they found to take revenge on my family because they have bodyguards.
Q. Is that your family on your father’s side or your mother’s side?
A. My father’s.
Q. When did this phone call explaining all this occur?
A. Before the attempt, they would say some things.
Q. This cousin of yours who is now the secretary of the mayor of Bogota, has she had any problems?
A. They have always received anonymous phone calls, always. In Bogota in the whole Colombia they are always calling and sending letters to terrorize people.
Q. So a lot of people get letters and phone calls?
A. Yes. If the person that’s involved in some political group or is the first time doing something that they are not in — that they don’t want this person to do for whatever reasons.
Q. Apart from all that you stated today, did anything else happen to you in Colombia?
A. No.
*1257 Q. What do you think would happen to you if you went back to Colombia?
A. I’d be killed. They already warned me when I returned in January.
Q. Did you tell the police about these latest phone calls?
A. No.
Q. Why not?
A. Because that is just not done. People cannot go make a report in Colombia.
Q. Ma’am, the government of Colombia is in an all out war with the guerrillas. The president of Colombia, Mr. Orebet (phonetic sp.) apparently has a very effective campaign. Well, I — I mean, how are they going to help if people don’t file— don’t tell them what’s happening?
A. Because when one is called on the phone and one is told do not make a report,- do not do this, do not do that, one doesn’t do it because people are afraid, people are afraid in Colombia.
Q. Anything else that you want to say?
A. No
JUDGE TO MS. SCHWARTZ
Ms. Schwartz?
MS. SCHWARTZ TO JUDGE
Yes, Your Honor, a few questions for her, thank you.
MS. SCHWARTZ TO MS. SILVA
Q. Ma’am, when did you buy your apartment in Miami Beach? Or when did you rent an apartment in Miami Beach?
A. I did not buy one. In November when I arrived. And also the first time that I came over. It’s an apartment in a hotel. It’s a room with a kitchen and bath.
Q. And how long was the lease for?
A. No, monthly.
Q. Okay, and at any time did anybody call you and ask you for money?
JUDGE TO MS. SCHWARTZ
In Colombia you mean?
MS. SCHWARTZ TO JUDGE
Q. In Colombia.
A. No.
Q. Did anybody ever call you in Colombia and ask you to collaborate with them?
A. No.
Q. Does your mother still live in her home above the restaurant?
A. Yes.
Q. And the restaurant is still open for business?
A. Yes.
Q. Is that a family restaurant?
A. I don’t understand.
Q. Does your family run it?
A. My mother does. And my family is supported by the earnings of that restaurant, my siblings.
JUDGE TO MS. SILVA
Wait, your brothers, male brothers?
MS. SILVA TO JUDGE
Four.
JUDGE TO MS. SCHWARTZ
Okay.
MS. SCHWARTZ TO MS. SILVA
Q. Do you all four of your brothers currently live in Colombia?
A. Yes.
Q. And do you have any sisters?
A. No.
Q. And your father, is- he still in Colombia?
A. No.
Q. Where is your father?
A. He died.
JUDGE TO MS. SILVA
*1258 Q. What do your brothers do in Colombia?
A. Well, they don’t do much, truly.
Q. What does that mean?
A. One doesn’t work, the other one has a temporary job and they all live in my mother’s house with her.
Q. Have they had any problems with the FARC or anybody?
A. No, none of them.
Q. Go — I mean, if this was a family thing why wouldn’t they come after your brothers?
A. They were not involved in politics.
Q. You said that your whole family was perceived as being members of the conservative party and because you are part of that family they wanted to get you.
A. Yes.
Q. What about your brothers?
A. No, my brothers have never been involved in politics. When I say my family I meant uncles, cousins, my father’s cousins. My father’s side of the family. My brothers have never been involved in politics.
MS. SCHWARTZ TO JUDGE
I just have one or two more questions, Your Honor.
MS. SCHWARTZ TO MS. SILVA
Q. On the day of October 9, 1999 you were followed from your restaurant, correct?
A. Yes, I suppose.
Q. Okay, and has this, the restaurant or your mother’s house ever been targeted by the FARC?
A. No, never.
MS. SCHWARTZ TO JUDGE
Okay, I have nothing further.
JUDGE TO MS. SILVA
Anything else that you want to say, ma’am?
MS. SILVA TO JUDGE
No.
JUDGE TO MS. SILVA
Ma’am, I realize why you were nervous about living in Colombia but I can’t find that you’ve been persecuted there. So I am going to deny your applications. Do you understand?
MS. SILVA TO JUDGE
Yes.
JUDGE TO MS. SILVA
You will have the right to appeal that and I will explain to you how to do that appeal and will give you the papers that you’ll need to fill out. Okay, understand?
MS. SILVA TO JUDGE
Yes.
JUDGE TO MS. SILVA
Okay, now if I deny your applications you have the right to designate the country where you want to be sent. You don’t have to designate a country. If you don’t do it I will do it for you. Do you wish to designate a country?
MS. SILVA TO JUDGE
No, I don’t know.

JUDGE RENDERS ORAL DECISION

JUDGE TO MS. SILVA
Okay, the Court will designate Colombia. Ma’am as I’ve told you I’ve denied your application for asylum because, you know, other than the general conditions of instability and violence in Colombia I don’t see that you are in any worse position than anybody else in that country. Do you understand?
MS. SILVA TO JUDGE
Um-hum.
JUDGE TO MS. SILVA
*1259 I may be mistaken and you have a right to appeal my decision to the Board of Immigration Appeals in Falls Church, Virginia. If you do apply that appeal it must be filed within 30 days directly with the Board, that is on or before January 13, 2003. Do you understand?
MS. SILVA TO JUDGE
Um-hum.
JUDGE TO MS. SILVA
Now, you have — is that a yes?
MS. SILVA TO JUDGE
Yes.
JUDGE TO MS. SILVA
Now, I’m going to give you the appeal form that you have to fill out and file. That appeal has to be filed, as I said, with, with the payment of the appeal fee. And if you don’t have money to pay that fee then you have to file for a fee waiver form, which I am also giving to you at this time. Do you understand? Do you understand?
MS. SILVA TO JUDGE
Um-hum.
JUDGE TO MS. SILVA
Yes?
MS. SILVA TO JUDGE
Yes.
JUDGE TO MS. SILVA
Okay. Now, that appeal has to be received either with the fee or with a fee waiver on or before January 13, 2003. If you file the appeál without the waiver or the fee then it will be as if you haven’t filed it and my order will become final. Do you understand?
MS. SILVA TO JUDGE
Yes.
JUDGE TO MS. SILVA
Now, you’ll continue to have the right to have an attorney help you out in this case including the preparation and filing of this appeal. If you don’t have money to pay for an attorney I will again provide you with a list of attorneys who can represent you at little or no charge. Do you understand?
MS. SILVA TO JUDGE
Um-hum, thank you.
JUDGE TO MS. SILVA
Okay. Remember that it is very important that you file your appeal with a fee or with a fee waiver on or before January 13, 2003. If you do not I will warn you again that my order will become final. Do you understand?
MS. SILVA TO JUDGE
Yes.
JUDGE TO MS. SILVA
And if you don’t file it then my order becomes final.
MS. SILVA TO JUDGE
Yes.
JUDGE TO MS. SILVA
Do you have any questions, ma’am?
MS. SILVA TO JUDGE
No.
JUDGE TO MS. SILVA
Okay, good luck, ma’am, if you decide to file that appeal.
JUDGE TO MS. SCHWARTZ
And Ms. Schwartz, do you, the Government, waives appeal?
MS. SCHWARTZ TO JUDGE
Yes, Your Honor.
JUDGE FOR THE RECORD
Case closed.

HEARING CLOSED

*1260 APPENDIX C
UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
Miami, Florida
File No.: A 79 344 105
December 13, 2002
In the Matter of LUZ MARINA SILVA, Respondent
IN REMOVAL PROCEEDINGS CHARGE: Section 237(a)(1)(B).
APPLICATIONS: Asylum, withholding of removal, and relief under the Torture Convention.
ON BEHALF OF RESPONDENT: Pro se
ON BEHALF OF SERVICE: Gail Schwartz, Esquire Assistant District Counsel

ORAL DECISION OF THE IMMIGRATION JUDGE

The respondent is a 48-year-old native and citizen of Colombia who was admitted to the United States on or about March 8, 2000 as a visitor for pleasure, and who remained in the United States beyond the date authorized by the Immigration and Naturalization Service (hereinafter the Service).
In a previous hearing before this Court the respondent, under oath, admitted to the factual allegations in the Notice to Appear. Based on her admissions, the Court finds that she is removable as charged under Section 237(a)(1)(B) of the Immigration and Nationality Act as having remained in the United States for a time longer than permitted. Removability, in fact, has been established by clear and convincing evidence through her sworn testimony. The Court will turn to the application for asylum, withholding of removal, and relief under the Torture Convention, which are the only issues remaining in the case.
The record before me contains the Country Reports and the Profile of Asylum Claims and Country Conditions prepared by the United States Department of State for the country of Colombia, which advised as to conditions in that country as of the date that it was issued.
The Attorney General’s regulations concerning asylum and withholding of removal pursuant to Sections 208 and 241(b)(3) of the Act are applicable to this case. Regarding withholding of removal under Section 241(b)(3), an applicant must meet the burden of proof set forth at 8 C.F.R. Section 208.16. The alien has to establish that her life or freedom would be threatened in the proposed country of removal because of her race, religion, nationality, membership in a particular social group or political opinion. Her life or freedom shall be found to be threatened if it is more likely than not that she will be persecuted because of one of these five enumerated grounds.
To establish eligibility for asylum, the applicant must-meet the burden of proof prescribed in 8 C.F.R. Section 208.13. Said regulation states that the applicant has to establish eligibility as a refugee as defined in Section 101(a)(42)(A) of the Act. Her testimony, if credible in light of the general conditions in her country of nationality, may be sufficient to sustain a burden of proof without further corroboration.
An applicant shall be found to be a refugee because of past persecution if she can establish that she has suffered past *1261 persecution because of one of the five previously enumerated grounds, and that she is unable or unwilling to return to or avail herself of the protection of the country where she suffered such persecution because of that persecution.
An applicant shall be found to have' a well-founded fear of future persecution if she can establish, first, that she has a fear of persecution in her country because of one of the five previously enumerated grounds, second, that there is a reasonable possibility of actually suffering some persecution if she were to return there, and, third, that she is unable or unwilling to return to or avail herself of the protection of her country because of such fear.
In evaluating whether the applicant has sustained her burden of proof the Immigration Judge shall not require her to provide evidence that she will be singled out individually for persecution if the applicant establishes that there is a pattern or a practice in her country of nationality of persecution or groups of persons similarly situated as the applicant because of one of the five previously enumerated grounds, and the applicant also establishes his inconclusion and identification with such groups of persons such that her fear of persecution upon return is reasonable.
This is a similar burden to that prescribed by the Board of Immigration Appeals in the Matter of Mogharrabi, 19 I & N Dec. 439 (BIA 1987) where the Board stated that an asylum applicant’s persecution claim must be plausible, detailed and coherent. The alien’s own testimony may, in some cases, be the only evidence available and can suffice that the testimony is believable, consistent and sufficiently detailed to provide a plausible and coherent account of the basis for her fear.
An applicant shall also be considered for eligibility for withholding of removal under the Torture Convention if she requests such consideration or if the evidence presented indicates that she will be tortured in the country of removal. See 8 C.F.R. Section 208.13(c)(1).
Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person. See 8 C.F.R. Section 208.18(a)(1). The severe pain or suffering must be inflicted on the applicant or a third person for one of four purposes, specifically, one, for obtaining information or a confession, two, for punishing for an act committed or suspected of having been committed, three, for intimidation or coercion, or, four, for any reason based on discrimination of any kind. In addition, in order to constitute torture, the act must be directed against a person in the offender’s custody or physical control. See 8 C.F.R. Section 208.18(a)(6). Further, the pain or suffering must be inflicted by or in the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. See 8 C.F.R. Section 208.18(b)(1).
The applicant for withholding of removal under the Torture Convention bears the burden of proving that it is more likely than not that she will be tortured if removed to the proposed country of removal. See 8 C.F.R. Section 208.16(b).
The respondent testified today in support of her applications for relief. She indicates that she and her whole family have always been a member of the conservative party in Colombia and that she has lived her entire life in Bogota, Colombia where she owns a restaurant, which is still operating, and is at this time being run by the respondent’s mother. She testified that she was involved in politics as a supporter of the present mayor of Bogota, Mr. Antanna Mockus. She first participated in support of Mr. Mockus’ candidacy for the mayor in 1994. Mr. Mockus won that *1262 election and was the mayor until he resigned to participate as a candidate for the presidency in 1997. The respondent also worked at that candidacy which was unsuccessful. The respondent then worked for Mr. Moekus’ second go at the mayoralty of Bogota. He won this campaign and is, as she stated, the actual mayor of Bogota, Colombia.
The respondent did not hold any official position in Mr. Moekus’ campaign or in the party nor did she speak publicly in support of Mr. Moekus for any political party. She helped in organizing the help brigades, and, talking to people, and other general work for the party and the candidacy. As stated, she was not a leader nor did she occupy just any particular position.
The respondent states that she has problems in Colombia because of her involvement in politics and also because her entire family was known to be supporting of the conservative party. She states that she started having problems towards the end of 1999. She indicates that she received several threatening calls, anonymous, indicating that she should stop what she was doing and that on October 9th of 1999 as she was leaving her restaurant and on her way to her apartment in her car, two men came along side in a motorcycle and fired shots at her car. She does not know who these men were but police said they were members of FARC because of the calls that she had been receiving. She had also received a condolence note about three weeks previous to the shooting announcing sympathy with her own passing and saying that she had been in the wrong place at the wrong time and allegedly signed by a guerrilla group known as the FARC. The Court asked her if she had this note and she indicates that she has lost it. She did not report any of the calls, the receipt of the card, nor the attempt on her life to the authorities in Colombia because she was told not to do so and it is dangerous to report these incidences to the police according to the respondent. Nevertheless, the respondent decided to leave Bogota and come to the United States which she did on November 21, 1999 as a tourist. She had previously been here on June 10,1999, also as a tourist and remained for one month. The respondent, when she came in November of 1999 stayed for a little over a month before returning to Bogota hoping that things were better. She did not indicate that she had requested any help from the government of the United States when she came here in November 21st of 1999 or indicated to anybody that she had problems in Colombia. The respondent returned to Colombia in January of 2000 and remained there for another two months before coming to the United States the last time on March 8, 2000. She has remained here since then.
The respondent indicates that after she returned to Colombia in November of 2000 hoping that things would be different, she started receiving daily anonymous calls telling her that she should not provoke the caller and that she would be killed. Again she did not report these calls to the authorities but decided to leave Colombia and come to the United States as stated in March of 2000.
The respondent’s mother remains in Colombia running her restaurant and she has four brothers who also remain in that country and are supported by the same restaurant and live with the respondent’s mother. Nothing has happened to any of these family members nor have there been any attempts on the respondent’s business nor any other reported problems. The respondent further states that she has a cousin who was even more active than her in support of the mayor of Bogota, Mr. Moekus, and that she is actually the secre *1263 tary. She indicates that this cousin has also received threatening calls and in fact states that many people in Colombia received threatening calls and letters and this was a common way of terrorizing the people.
The only incident that respondent referred to which could qualify as past persecution would be the shooting of October 9th of 1999 and the respondent indicates that she does not know who shot her nor has in any other way identified who or why she was shot except for explaining that she had received anonymous calls and a condolence note. The respondent, although she may have been active in support of political candidacy of the actual mayor of Bogota, was in fact not in any leadership role in politics nor has she explained any other reason why she will be singled out other than saying that her whole family was a member of the conservative party and that she was being made an example. She speculates that nobody else has been harmed in her family because everybody has bodyguards. However, she indicates that her four brothers live in Bogota and they have had no problems.
Although the Court recognizes that conditions in Colombia are in fact violent, everybody in Colombia suffers under these general conditions of violence and criminal activity. The respondent has not supplied any evidence to show that she was either persecuted in the past nor that she has a well-founded fear of being persecuted in the future for any of the five previously enumerated grounds. Additionally, she always lived in Bogota has not explained why she could not have lived in another part of Colombia if she in fact felt threatened in the city of Bogota. In addition, she never, if she felt that she was in danger in Colombia, gave the authorities the opportunity to help or protect her. The Court finds that the respondent therefore failed to show that she qualifies for the relief that she seeks. The Court will deny her application for asylum as well as her application for withholding of removal which requires a higher standard of proof. The Court further finds that the respondent has failed to show that there is any likelihood of possibility that she will be tortured if she returns to Colombia as that in turn has been previously defined. The following orders will be issued.
ORDER
IT IS HEREBY ORDERED that the applications for asylum and withholding of removal be denied.
IT IS FURTHER ORDERED that relief under the Torture Convention be denied.
IT IS FURTHER ORDERED that respondent be removed and deported to Colombia.

CERTIFICATE PAGE

I hereby certify that the attached proceeding before JUDGE PEDRO MIRANDA, in the matter of:
LUZ MARINA SILVA
A 79 344 105
Miami, Florida
is an accurate, verbatim transcript of the cassette tape as provided by the Executive Office for Immigration Review and that this is the original transcript thereof for the file of the Executive Office for Immigration Review.
/s/ Elizabeth M. Cochran, Transcriber
Free State Reporting, Inc.
1324 Cape St. Claire Road
Annapolis, Maryland 21401
(301) 261-1902
*1264 March 1, 2003
(completion date)
By submission of this CERTIFICATE PAGE, the Contractor certifies that a Sony BEC/T-147, 4-channel transcriber or equivalent, as described in Section C, paragraph C.3.3.2 of the contract, was used to transcribe the Record of Proceeding shown in the above paragraph.